# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

QBE INSURANCE CORP. a/s/o BAR
CON KAT d/b/a CHERRY STREET
EAST,
     Plaintiff,

     v.

INTERSTATE FIRE & SAFETY
EQUIPMENT COMPANY, INC.,
     Defendant.

No. 3:07cv1883 (SRU)

## RULING ON MOTION FOR PROTECTIVE ORDER

This case concerns a fire that erupted on April 30, 2006 in the kitchen of Cherry Street

East, a restaurant located in New Canaan, Connecticut. The plaintiff, QBE Insurance

Corporation ("QBE"), is the insurer and subrogee of Cherry Street East; the defendant, Interstate

Fire & Safety Equipment Company, Inc. ("Interstate"), is the installer of a fire suppression

system that allegedly failed to extinguish the fire.[1] QBE is suing in its capacity as subrogee to

hold Interstate liable for damage to the restaurant. This ruling concerns a discovery dispute

between the parties: whether claim notes by QBE's first-party adjustor are non-discoverable

work product and, accordingly, whether Interstate is barred from deposing the first-party adjustor

about the contents of those claim notes.

QBE moves for a protective order limiting the scope of Interstate's deposition of George

Stickle, who supervised QBE's first-party adjustor. Specifically, QBE aims to prevent Interstate

from questioning Stickle about any mental impressions or opinions concerning this litigation that

it maintains are protected by the work-product doctrine. In a telephone conference held October

---

[1] The two other defendants, Enodis Corp. and Howard Arnold, Inc., were previously
dismissed (docs. # 152, # 181).

14, 2010 during which the parties argued the instant motion for a protective order, QBE represented that it had redacted portions of Stickle's claim notes because they constituted protected work product, and that its motion was intended to prevent Interstate from learning that redacted information from Stickle in the course of his deposition. Interstate disputes that Stickle's claim notes or any statements Stickle may make at his deposition are protected. I ordered QBE to submit the contested claim notes to me in camera and requested that the parties submit briefs on the privilege question. (Doc. # 165.)

For the reasons set forth below, QBE has not met its burden of proof that Stickle's claim notes are protected work product. Its motion for a protective order is therefore denied. QBE argues that Stickle's claim notes are protected under two separate evidentiary privileges found at Rule 26 of the Federal Rules of Civil Procedure: the work-product doctrine and the non-testifying expert privilege. I address each asserted privilege separately.

## I.   WORK-PRODUCT PRIVILEGE

The scope of discovery under the Federal Rules is defined broadly: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to the party's claim or defense." Fed. R. Civ. P. 26(b)(1). Rule 26, however, provides for several exceptions to the Federal Rules' policy of liberal discovery. The work-product doctrine is one such example. Rule 26(b)(3)(A) provides:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if: (i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Rule 23(b)(3) "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)). At the core of protected work product are "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation;" under Rule 26, that kind of opinion evidence is absolutely protected. Fed. R. Civ. P. 26(b)(3)(B). In determining whether the work-product doctrine applies, a court must undertake a two-step analysis. First, it must decide whether the sought "documents and tangible things" were "prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). The party asserting work-product protection bears the burden of proof on that step. If the party asserting work-product protection meets its burden, then the court moves to the second step of analysis, which examines whether the evidence is nonetheless discoverable. That requires the party seeking discovery to show that the documents and other tangible things are otherwise discoverable under Rule 26(b)(1) and that the party "cannot, without undue hardship, obtain their substantial equivalent by other means." *Id.* QBE's motion can be decided entirely on the first step of the analysis, however, because it has failed to demonstrate that Stickle's claim notes are protected work product.

Key to QBE's motion is the meaning of the words "prepared in anticipation of litigation" in Rule 26(b)(3)(A). In *Adlman*, the Second Circuit clarified that documents need not "be produced primarily or exclusively to assist in litigation in order to be protected" by the work-product doctrine. 134 F.3d at 1198. The doctrine, rather, encompasses other documents created "because of the prospect of litigation." *Id.* at 1202 (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994)). Thus,

documents that analyze the prospect of, or likelihood of success in, litigation "do[] not lose protection under this formulation merely because [they are] created in order to assist with a business decision." *Id.* But the *Adlman* Court was clear to distinguish that not all documents that address possible future litigation risks and outcomes constitute protected work product. "[I]t should be emphasized that the 'because of' formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation. It is well established that work-product privilege does not apply to such documents." *Id.*

Whether the first-party adjustor claim notes are protected hinges on whether they were created "because of" anticipated litigation or in the ordinary course of QBE's business. As the district court in *Weber v. Paduano*, No. 02cv3392 (GEL), 2003 WL 161340 (S.D.N.Y. Jan. 22, 2003), explained, resolving that question with respect to an insurance company's claim notes can prove challenging. A first-party insurer is apt to investigate any claim in the shadow of future litigation, either as a potential defendant if it denies the insured's claim or as a potential plaintiff if it exercises subrogation rights against a third party.

> The determination as to whether materials are protected under this definition is necessarily fact-specific. This is even more true where, as here, the documents in question were created by or for an insurance company in the course of its investigation, since the very business of the producing party is to evaluate claims that may ultimately ripen into litigation. . . . Thus, courts presented with work product disputes in the insurance context must be careful not to hold that documents are protected from discovery simply because of a party's "ritualistic incantation" that all documents created by insurers are made in preparation for litigation, and mindful of the fact that insurer-authored documents are more likely than attorney-authored documents to have been prepared in the ordinary course of business, rather than for litigation purposes.

*Id.* at *4 (quotation omitted). Because all insurance investigations are likely performed with an eye towards the prospect of future litigation, "it is particularly important that the party opposing

- 4 -

production of the documents, on whom the burden of proof as to the privilege rests, demonstrate by specific and competent evidence that the documents were created in anticipation of litigation." *Id.*

QBE has not met its burden to sustain work-product protection. QBE argues that the claim notes it seeks to protect represent the mental impressions, opinions, and conclusions of the first-party adjustor concerning this anticipated litigation. Its description is belied by the contents of the claim notes, however, which show that the notes were written in the normal course of the insurer's business and not with regard to the prospect of a subrogation suit.

QBE contends that the claim notes are privileged because Stickle wrote them following QBE's decision to pursue subrogation claims against the defendants for causing the fire at Cherry Street East. In support, QBE offers an affidavit by Stickle, in which he represents that on May 5, 2006, QBE's cause-and-origin expert determined that a third party may have been responsible for the fire and that "[o]nce we know that there are other parties responsible for a loss, we put them on notice and anticipate litigation in the form of a subrogation action. Since parties are typically not willing to pay for a loss they caused, subrogation almost always leads to litigation, as was the case here." Stickle Aff. ¶¶ 5-6 (Doc. # 163, Ex. 1). Based on those assertions, QBE reasons all actions it took following May 5, 2006 with respect to the Cherry Street East fire were performed "in anticipation of litigation" under Rule 26(b)(3)(A). *Id.* ¶ 8.

QBE's argument suffers from two shortcomings. First, the evidence in the record does not support the suggestion that QBE had made any decision with respect to its subrogation rights before November 8, 2006, the date of the last claim note QBE seeks to shield from discovery. Although QBE had reason to believe that another party was potentially responsible for the Cherry Street East fire by May 5, 2006, the evidence shows that QBE had not settled on pursuing

subrogation, and was only investigating whether it had subrogation rights to enforce. *See id.* (attachments to Stickle Affidavit of letters QBE sent to third parties advising them that they "may be responsible for the damages that occurred" and that QBE would perform another inspection of the fire damage, to which the third parties were invited to attend). Indeed, the disputed claim notes confirm that QBE had not yet decided on pursuing subrogation against third parties, but was still in the course of deciding whether subrogation claims would be viable. Several of those claim notes, for instance, are opinions by Stickle regarding the merits of a "potential" subrogation claim against third parties.

*Weber* is instructive that the work-product doctrine applies only once an insurer has decided upon pursuing a subrogation action, and not at the preliminary stage when the insurer is still investigating the possibility of subrogation.

> [A]n insurer does not have an identifiable resolve to litigate . . . until it has made a decision regarding subrogation. Until that point, an investigation into the potential for subrogation is simply part of an insurer's ordinary practice of investigating all issues arising from an accident involving its insureds, and documents created as part of this process would have been created in the same form regardless of the insurer's eventual decision as to litigation.

*Weber*, 2003 WL 161340, at *8. Moreover, in *Weber*, the court denied application of the doctrine on stronger facts that the documents in question were prepared in anticipation of litigation. There, the insurer had hired attorneys to conduct the investigation into subrogation. *Id.* QBE's submitted evidence, however, does not show any attorney involvement or, for that matter, any legal steps taken toward a subrogation suit.

Lacking evidence that it had made a decision with respect to subrogation before preparation of the claim notes, QBE instead attempts to win its motion for a protective order by leaping from (1) the naked statement that an investigation regarding subrogation *often* leads to a subrogation lawsuit to (2) the conclusion that *all* investigations regarding subrogation should be

treated as if they were performed in anticipation of litigation. *See* Stickle Aff. ¶¶ 5-6. That reasoning, however, would greatly undermine the Second Circuit's declaration that the work-product doctrine does not encompass "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." *Adlman*, 134 F.3d at 1202. It is standard practice for insurers to investigate claims in order to analyze not only whether they have potential subrogation rights against third parties, but, more fundamentally, whether they must provide insurance coverage under their policies. *Weber*, 2003 WL 161340, at *8; *see also Fine v. Bellefonte Underwriters Ins. Co.*, 91 F.R.D. 420, 422 (S.D.N.Y. 1981) ("The investigation and evaluation of claims is part of the regular, ordinary and principal business of insurance companies."). To hold that claims investigations are always and inherently undertaken in anticipation of litigation would erase the line the *Adlman* Court drew between protected work product and unprotected conduct in the normal course of business. *See Weber*, 2003 WL 161340, at *4 (warning against application of the work-product privilege on basis of insurer's "ritualistic incantation" that its documents are always produced because of the prospect of litigation). More generally, that argument would run afoul of the Federal Rules' overarching policy of broad and liberal discovery in civil litigation. *See* Fed. R. Civ. P. 26(b)(1).

QBE has failed to introduce evidence showing it would not have taken the steps to investigate the fire at issue but for the prospect of the instant litigation. It has therefore failed to prove that Stickle's claim notes were made "in anticipation of litigation." Stickle's claim notes are not protected by the work-product doctrine of Rule 26(b)(3)(A).

## II.    NON-TESTIFYING EXPERT PRIVILEGE

QBE also seeks to shield some of Stickle's claim notes by asserting the non-testifying expert privilege. Those claim notes reflect Stickle's conversations with purported experts who

investigated the cause and origin of the Cherry Street East fire. Because those experts will not testify at trial, QBE seeks to protect against the disclosure of Stickle's conversations under Rule 26(b)(4)(D), which provides that:

> Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party *in anticipation of litigation or to prepare for trial* and who is not expected to be called as a witness at trial. But a party may do so only: (i) as provided in Rule 35(b); or (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

Fed. R. Civ. P. 26(b)(4)(D) (emphasis added).[2]

The restriction on discovery regarding non-testifying experts is written in language analogous to the restriction on discovery of work product. In particular, Rule 26(b)(4)(B), like Rule 26(b)(3)(A), requires as a condition of restricting discovery that the non-testifying expert be retained or employed "in anticipation of litigation." That phrase, which appears in identical form in two subsections of Rule 26(b), is best interpreted as sharing the same meaning. *See Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40, 45 (2d Cir. 1988) ("Construing identical language in a single statute *in pari materia* is both traditional and logical."). Therefore, *Adlman*'s definition of the phrase "in anticipation of litigation" to mean "because of the prospect of litigation" applies to Rule 26(b)(4)(B) just as it does when considering a claim of work product under Rule 26(b)(3)(A). That interpretation is bolstered by the original advisory committee notes to Rule 26(b)(4), which confirm that the non-testifying expert privilege may only be invoked when an expert has been retained or specially employed because of the prospect of litigation, and not in the normal course of business.

---

[2] The non-testifying expert privilege was previously codified at Rule 26(b)(4)(B). 2010 Advisory Committee Notes to Fed. R. Civ. P. 26.

Subdivision 26(b)(4)[(D)] deals with an expert who has been retained or specially employed by the party in anticipation of litigation or preparation for trial (*thus excluding an expert who is simply a general employee of the party not specially employed on the case*) . . . . Subdivision 26(b)(4)[(D)] is concerned only with experts retained or specially consulted in relation to trial preparation. Thus the subdivision precludes discovery against experts who were informally consulted in preparation for trial, but not retained or specially employed.

1966 Advisory Committee Notes to Fed. R. Civ. P. 26 (emphasis added).

As explained in the previous section, QBE has not met its burden of proving that Stickle's claim notes were written because of the prospect of litigation. On the contrary, the evidence shows that Stickle prepared the claim notes in the normal course of his duties as a supervisor for QBE's first-party adjustor. The same is true of the conversations Stickle recorded with QBE's cause-and-origin experts. QBE has not met its burden of proof that those conversations were held outside its normal course of business and because of the prospect of litigation. Rather, by all indications, Stickle would have spoken with cause-and-origin experts and summarized those dialogues in his claim notes irrespective of this lawsuit. For the same reason that QBE cannot sustain its assertion of the work-product doctrine, QBE's evidence is insufficient to qualify for protection from discovery under Rule 26(b)(4)(D).

## III.  CONCLUSION

Because QBE has not met its burden to demonstrate that Stickle's claim notes are protected from discovery, its motion for a protective order is (doc. # 157) is DENIED. QBE shall disclose without redaction the disputed claim notes to Interstate. Furthermore, Interstate is permitted to inquire about those claim notes at Stickle's deposition.

To the extent that QBE is still seeking to hold Stickle's deposition in New Jersey, the motion for a protective order is denied without prejudice. During the October 14, 2010 telephone conference, I left this part of the motion undecided and, instead, encouraged the parties

to meet and confer in order to resolve this dispute.  (Doc. # 165.)  If the parties are still in disagreement regarding the location of Stickle's deposition, QBE may file a new motion for a protective order.  I note, however, that although QBE claims that Stickle's deposition in Connecticut would require him to travel more than 100 miles by road, the proper measurement under Rule 45(c)(3)(A)(ii) is whether the deposition will require Stickle to travel more than 100 miles "as the crow flies," i.e., by a straight line.  *See Sprow v. Hartford Ins. Co.*, 594 F.2d 412, 417-19 (5th Cir. 1979) (using the crow's-flight measurement for the 100-mile distance for service of process on out-of-state defendants); *SCM Corp. v. Xerox Corp.*, 77 F.R.D. 16, 18 (D. Conn. 1977) (applying crow's-flight measurement for 100-mile measurement for determining use of depositions at trial).

It is so ordered.

Dated at Bridgeport, Connecticut, this 18th day of February 2011.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge